D. M. FERRY & CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1898.)

No. 484.

1. REVENUE LAWS—AUTHORITY OF SECRETARY OF TREASURY.

Congress may, if it sees fit, make the secretary of the treasury the final arbiter, in any class of cases arising under the revenue laws, to determine in a quasi judicial manner whether by virtue of those laws any claim against the government has arisen in favor of the petitioner.

2. SAME—REFUND OF DUTIES—DESTRUCTION OF IMPORTED PROPERTY.

Rev. St. § 2984, authorizing the secretary of the treasury, on satisfactory proofs of the destruction of imported merchandise while in the custody of the customs officers, etc., makes the secretary the final tribunal to decide on the validity of any such claim, and his decision is not subject to review by the court of claims or any other tribunal.

3. SAME.

The above section does not authorize the refunding of duties on merchandise destroyed after it has been delivered into the manual possession of the importer, on his giving bond for redelivery to the customs officers, under Rev. St. § 2899.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is a proceeding in error to review a judgment of the circuit court sustaining a demurrer to the petition of the plaintiff and dismissing the same.

The petition was filed under the act of March 3, 1887, which provides for the bringing of suits against the United States. The petition set forth:

That the plaintiff, D. M. Ferry & Co., was a corporation organized under the laws of the state of Michigan. That it imported through the port of Detroit

996 packages of seeds, on which the estimated duty was $2,350.40. That before any part or portion of said merchandise had been inspected or appraised, the plaintiff paid to the United States the sum of $2,350.40, the estimated duties thereon. That on the 28th of December, 1885, the petitioner executed a bond with approved security, and double the estimated value of the merchandise, in conformity with section 2899 of the Revised Statutes of the United States, conditioned that the petitioner should deliver such merchandise to the order of the collector at any time within 10 days after the package sent to the public store had been appraised and reported to the collector, and that if any package should be opened without the consent of any collector or surveyor, or out of the presence of one of the inspectors of customs, or if a package should not be delivered to the order of the collector, according to the condition of the bond, that said bond should in either case be forfeited. That thereupon said merchandise was delivered into the manual possession of the petitioner, and held by it under said bond, in conformity with the act of congress, until the 1st day of January, 1886, when the merchandise was wholly destroyed by accidental fire, while the same was in the manual possession of the petitioner under the bond aforesaid. That afterwards, on the 9th day of January, 1886, the petitioner, through the collector of customs in Detroit, presented its petition, duly sworn to, setting forth all and singular the facts hereinbefore stated to the secretary of the treasury for a refund of the duties under section 2984 of the Revised Statutes of the United States. That on the 13th day of January, 1886, the secretary of the treasury denied the petition of the petitioner in the following letter:

"Treasury Department, Office of the Secretary.

"Washington, D. C., January 13, 1886.

"Collector of Customs, Detroit, Mich.—Sir: The department is in receipt of your letter of the 9th inst., transmitting the application of D. M. Ferry & Co. for a refund of duties exacted at your port on certain seeds, which, as alleged, were destroyed by accidental fire while in the importers' store at your port. It appears that the seeds in question were not entered in bond, and were not in bonded warehouse at the time of their destruction, but, having been entered for consumption at the time of importation, had been delivered to the parties, who deposited them in their own store, which was destroyed by fire on the 1st instant. The claim is made that the merchandise in question at the time of the fire was in bond, and in the custody of the officers of the customs, and that the applicants are entitled to a refund of the duties paid thereon, under the provisions of section 2984 of the Revised Statutes. That section authorized the omission or refund of the duties on any imported merchandise, which may be injured or destroyed by accidental fire or other casualty, while the same remained in the custody of the officers of the customs in any public or private bonded warehouse under bond, or in the appraisers' store undergoing appraisal, or while in transportation under bond, or while in the custody of the officers of the customs and not in bond, etc.; but it does not authorize any relief in a case, as in this instance, when the merchandise had been entered for consumption, and, after payment of duties, duly delivered into the custody and control of the importers thereof. Here the goods had absolutely left the custody of the customs officers, and were not under their care or control. They had been removed from the restraint and protection of the customs officers, and consequently, as the right of the government to exercise any care over them had ceased, the government had no further concern therein. This case seemed to be almost parallel to that covered by department's ruling of January 2, 1883 (S. D. 5507), where the department declined to take any action in a case where certain lumber was burnt at Oswego under similar circumstances. In both cases the merchandise was entered for consumption, and had been delivered to the importers, prior to the casualty. The facts that the usual penal bond had been taken did not place the merchandise in the category of being 'in the custody of the officers of the customs in any public or private warehouse under bond,' as prescribed by said section 2984. The claim is therefore rejected.

"Respectfully yours, C. S. Fairchild, Assistant Secretary."

That no part of petitioner's claim had since been allowed or paid to it, except $220 refunded on part of the merchandise. That under the acts of congress it had

a claim against the United States for $1,900 and interest from the 26th day of December, 1885.

The prayer of the petition was that a judgment and decree upon the facts and law, in conformity with the said act of congress approved March 3, 1887, should be entered in favor of the petitioner.

To this petition the district attorney filed a demurrer on the following grounds:

"(1) That the seeds, for the duties on which the petitioners claim under said petition, had been delivered to the petitioners, and were destroyed by fire while in their custody and control, and were not, at the time of their destruction, in the custody of the officers of the customs, or of any officers of the United States. (2) That the claim on which said petition is based was on, to wit, the 13th day of January, 1886, rejected and reported on adversely by a department of the government of the United States authorized to hear and determine the same, to wit, by the treasury department; and it is provided by the act of congress of March 3, 1887, referred to in said petition, that where a claim had been, prior to the passage of said act of congress, rejected or reported on adversely by any court, department, or commission authorized to hear and determine the same, neither the circuit nor district court of the United States shall have jurisdiction to hear and determine such claim. (3) That the matter of abating or refunding the duties paid upon the merchandise in question is entirely within the discretion of the secretary of the treasury, and the secretary of the treasury having exercised that discretion, and decided against the claim of the petitioners, the matter is settled, and there is no valid claim for such duties against the United States."

There was a joinder in the demurrer, the demurrer was sustained, and the petition dismissed.

Otto Kirchner, for plaintiff in error.

Alfred P. Lyon, for the United States.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The judgment of the circuit court must be affirmed on two grounds: First, because the court below had no jurisdiction of the petition on the facts stated therein; and, second, because, even if the cause of action stated in the petition was within the jurisdiction of the court, neither section 2984 nor any other statute gave the petitioner the right, under the circumstances stated, to recover back the duties which he had paid.

1. The act of March 3, 1887, entitled "An act to provide for the bringing of suits against the government of the United States," by its first section vests the court of claims with jurisdiction to hear and determine the following matters:

"First. All claims founded upon the constitution of the United States or any law of congress, except for pensions, or upon any regulation of an executive department, or upon any contract, expressed or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity or admiralty, if the United States were suable: provided, however, that nothing in this section shall be construed as giving to either of the courts herein mentioned, jurisdiction to hear and determine claims growing out of the late Civil War, and commonly known as 'war claims,' or to hear and determine other claims which have heretofore been rejected, or reported on adversely by any court, department, or commission authorized to hear and determine the same."

By the second section circuit courts of the United States are vested with concurrent jurisdiction in all the cases described in the first section where the amount of the claim exceeds $1,000 and does not exceed $10,000. The money sought to be recovered in this petition was paid on the 28th of December, 1885; the fire occurred on the 1st of January, 1886; the petition to the secretary of the treasury was filed January 9, 1886; and the claim was rejected on January 13, 1886. The petition was filed under section 2984 of the Revised Statutes of the United States, which reads as follows:

"The secretary of the treasury is hereby authorized upon production of satisfactory proof to him of the actual (injury) or destruction, in whole or in part, of any merchandise, by accidental fire, or other casualty, while the same remained in the custody of the officers of the customs in any public or private warehouse under bond, or in the appraisers' stores undergoing appraisal, in pursuance of law or regulations of the treasury department, or while in transportation under bond from the port of entry to any other port in the United States, or while in the custody of the officers of the customs and not in bond, or while within the limits of any port of entry, and before the same have been landed under the supervision of the officers of the customs to abate or refund, as the case may be, out of any moneys in the treasury not otherwise appropriated, the amount of impost duties paid or accruing thereupon; and likewise to cancel any warehouse bond or bonds, or enter satisfaction thereon in whole or in part, as the case may be."

This section gave the secretary of the treasury authority to hear and determine claims for refunds coming within this section. He could not exercise that authority without first determining the facts, and then applying the law of the section to them. In the case at bar he rendered his decision that on the facts stated the petitioner did not bring his case within the section, and that therefore the petition filed under the section must be rejected. The claim of the petitioner, therefore, was within the proviso of the act of the first section of March 3, 1887. It was a claim which had been rejected before the passage of the act by the treasury department, whose head was authorized to hear and determine the same. Section 2984 is a part of chapter 7, making regulations for the bond and warehouse system, under title 34, for the collection of duties upon imports. It is a well-settled principle in federal jurisprudence that the government of the United States has the right to provide for the summary collection of its revenues and to restrict the duty payer to certain special tribunals and certain specific remedies for acts of injustice that may be done on behalf of the government under such a system. Murray's Lessee v. Improvement Co., 18 How. 272. It may, if it sees fit, make the secretary of the treasury the final arbiter, in any class of cases arising under the revenue laws, to determine in a quasi judicial manner whether, by virtue of those laws, any claim against the government has arisen in favor of the petitioner. As was said by Mr. Justice Davis, speaking for the supreme court, in the case of Nichols v. U. S., 7 Wall. 122, 127, in considering the obligation of a party to file a protest before bringing suit to recover duties paid, as required by law:

"The allowing a suit at all was an act of beneficence on the part of the government. As it had confided to the secretary of the treasury the power of deciding in the first instance on the amount of duties demandable on any specific importation, so it could have made him the final arbiter in all disputes concerning the same."

We hold that, as neither section 2984 nor any other part of the revenue laws gave to the federal courts appellate power to review the decision of the secretary of the treasury under the section, he was made the final judge or tribunal to decide upon the validity of the claim in question. Section 2984 was first embodied in the statutes of the United States by the act of March 28, 1854. 10 Stat. 273. At that time there was no court of claims. At the time of the passage of the act, therefore, it must have been the intention of congress that the secretary of the treasury, and no one else, should pass on the facts and law of the claim to be made under section 8 of the act of March 28, 1854, of which, as already said, section 2984 is only an amendment. The first act establishing the court of claims, passed February 24, 1855, gave to that court the right to hear and determine all claims founded on any laws of congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government of the United States. It is contended that, as this claim was founded upon a law of congress, the court of claims act subjected the secretary's decision upon it, under section 2984, to the reviewing power of that court, even if it was final before the court was established.

Upon this question, however, we have a controlling authority to the contrary in the case, already cited, of Nichols v. U. S., 7 Wall. 122. In that case Nichols & Co., merchants of New York, imported, before 1851, certain casks of liquor, and paid the duties on the quantity as invoiced. A portion of the liquor had leaked, and, being lost, was, in fact, never imported at all into the United States. The importers made no written protest, as required by the customs law of the United States, but some five years afterwards filed a petition in the court of claims, seeking to recover a judgment against the United States on the ground that the court had power to hear and determine all claims founded upon any law of congress, and upon any contract, express or implied, with the government of the United States. The court first held that, if the court of claims had power to hear and determine claims under the revenue laws by virtue of the act establishing it, the payment of duties without protest was a voluntary payment, and that there was no implied promise on the part of the government to pay it back. But the court was not content to leave the case upon that ground of decision, and proceeded further, as follows:

"But, after all, the important subject of inquiry is, did congress, in creating the court of claims, intend to confer on it the power to hear and determine cases arising under the revenue laws? The prompt collection of the revenue, and its faithful application, is one of the most vital duties of government. Depending, as the government does, on its revenue to meet, not only its current expenses, but to pay the interest on its debt, it is of the utmost importance that it should be collected with dispatch, and that the officers of the treasury should be able to make a reliable estimate of means, in order to meet liabilities. It would be difficult to do this, if the receipts from duties and internal taxes paid into the treasury were liable to be taken out of it, on suits prosecuted in the court of claims for alleged errors and mistakes, concerning which the officers charged with the collection and disbursement of the revenue had received no information. Such a policy would be disastrous to the finances of the country, for, as there is no statute of limitations to bar these suits, it would be impossible to tell, in advance, how much money would be required to pay the judgments obtained on them, and the result would be that the treasury estimates for any current year would be unreliable. To guard against such consequences, congress has from time to time passed

laws on the subject of the revenue, which not only provide for the manner of its collection, but also point out a way in which errors can be corrected. These laws constitute a system which congress has provided for the benefit of those persons who complain of illegal assessments of taxes and illegal exactions of duties. In the administration of the tariff laws, as we have seen, the secretary of the treasury decides what is due on a specific importation of goods; but, if the importer is dissatisfied with this decision, he can contest the question in a suit against the collector, if, before he pays the duties, he tells the officers of the law, in writing, why he objects to their payment. And an equal provision has been made to correct errors in the administration of the internal revenue laws. The party aggrieved can test the question of the illegality of an assessment, or collection of taxes, by suit; but he cannot do this until he has taken an appeal to the commissioner of internal revenue. If the commissioner delays his decision beyond the period of 6 months from the time the appeal is taken, then suit may be brought at any time within 12 months from the date of the appeal. Thus, it will be seen that the person who believes he has suffered wrong at the hands of the assessor or collector can appeal to the courts; but he cannot do this until he has taken an intermediate appeal to the commissioner, and at all events he is barred from bringing a suit unless he does it within a year from the time the commissioner is notified of his appeal. The object of these different provisions is apparent. While the government is desirous to secure the citizen a mode of redress against erroneous assessments or collections, it says to him: 'We want all controverted questions concerning the revenue settled speedily, and, if you have complaint to make, you must let the commissioner of internal revenue know the grounds of it; but, if he decides against you, or fails to decide at all, you can test the question in the courts, if you bring your suit within a limited period of time.' These provisions are analogous to those made for the benefit of the importing merchant, and the same results necessarily follow. If the importer does not protest, his right of action is gone. So, if the party complaining of an illegal assessment does not appeal to the commissioner, he is also barred of the right to sue, and he is without remedy, even if he does appeal, unless he sues within 12 months. Can it be supposed that congress, after having carefully constructed a revenue system, with ample provisions to redress wrong, intended to give to the taxpayer and importer a further and different remedy? The mischiefs that would result if the aggrieved party could disregard the provisions in the system designed expressly for his security and benefit, and sue at any time in the court of claims, forbid the idea that congress intended to allow any other modes to redress a supposed wrong in the operation of the revenue laws than such as are particularly given by those laws. Without pursuing the subject further, we are satisfied that cases arising under the revenue laws are not within the jurisdiction of the court of claims."

To avoid the effect of the Nichols Case upon the question before us, it is pointed out that in that case the revenue laws themselves provided a remedy by which the taxpayer might bring the secretary's decision under review in the courts, but that here there is no such provision. This is true, but the Nichols Case did not proceed on the ground that there had been an appeal to the courts provided for within the revenue acts themselves; nor was it intimated that a suit in the court of claims would have been permitted had no such appeal to the courts been provided. On the contrary, the plain effect of the decision is that if the intention of congress is manifest to create the secretary of the treasury a tribunal to decide whether a wrong has been committed under the revenue law, and has made no provision for an appeal, because the revenue law provides a complete system within itself, the presumption must be that it was intended to make the decision of the special tribunal thus established final.

Neither the case of U. S. v. Kaufman, 96 U. S. 567, nor that of Campbell v. U. S., 107 U. S. 407, 2 Sup. Ct. 759, is in conflict with

the decision in the Nichols Case. In the case of U. S. v. Kaufman, the petition was filed in the court of claims to recover an amount allowed as a refund of internal revenue tax by the commissioner of internal revenue, which the comptroller of the treasury had refused to pay. In that case the tribunal appointed by the internal revenue laws to decide the case had decided it in favor of the petitioner, and it was the duty of the treasury officials to pay the money thus allowed against the government. They had not done so, and this petition was nothing more than a suit to enforce the judgment rendered by the officer having authority to render such a judgment against the United States. And so, in the case of Campbell v. U. S., a section of the customs law provided that there should be allowed on all articles wholly manufactured of materials imported, on which duties had been paid and which had thereafter been exported, a drawback equal in amount to the duty paid on such materials, and no more, to be ascertained by such regulations as should be prescribed by the secretary of the treasury. The secretary of the treasury had prescribed regulations for ascertaining the amount of drawback due, but the collector, whose duty it was to allow the same, refused to do so; and the court held that, on his failure so to do, the party entitled to the drawback could bring a suit in the court of claims to establish the liability of the government and obtain judgment thereon. The decision was founded on the ground that the duty of the collector and of the secretary in such cases was merely ministerial, that the right to recover and the amount to be recovered was fixed by law, and that neither the secretary nor the collector was constituted a tribunal to decide upon the validity of the claim.

The case before us is very like U. S. v. Black, 128 U. S. 40, 9 Sup. Ct. 12. In that case a pensioner applied to the commissioner of pensions to have his pension increased. The commissioner of pensions construed the pension law, and held that, on the facts stated by him, he was not entitled to such an increase. The pensioner thereupon applied to the supreme court for the District of Columbia for a mandamus to compel the commissioner to allow his claim, on the ground that he had misconstrued the law of the United States securing to the pensioner such an increase on the facts admitted. The supreme court held that where congress vested in an executive officer the power to hear and determine claims against the government of the United States, with no provision for an appeal to the courts, his decision was final, in so far as to prevent a direct review of the same by the proceeding in mandamus to compel the officer to act in accordance with the view of the law which the court might take. It is true that the suit was not a suit before the court of claims. From the jurisdiction of that court are expressly excluded all claims for pensions. But the principle there applied is entirely applicable here. To give the court of claims jurisdiction to hear and determine a claim which by law is to be heard and determined by an executive officer is to allow the court of claims to review the decision of that executive officer. That congress may do this is unquestioned. But that congress is not to be presumed to have done this in a case arising under the revenue laws, where the secretary of the treasury is made the arbiter to hear and determine such a claim, is set-

tled in the Nichols Case. The court, in U. S. v. Black, followed an earlier decision of Decatur v. Paulding, 14 Pet. 497, and made very clear, by reason and authority, the distinction between the mere ministerial act of the executive officer, which may be controlled by the courts by mandamus, and an act in the performance of which an officer is vested with quasi judicial discretion.

There is nothing in the case of U. S. v. Harmon, 147 U. S. 268, 13 Sup. Ct. 327; Id., 43 Fed. 560,—in conflict with the conclusion we have reached. In that case the question was whether, under the act of March 3, 1887, the circuit court of the United States had jurisdiction to consider claims for official fees made by a United States marshal, and disallowed by the first comptroller before March 3, 1887; in other words, whether the disallowance by the comptroller was a rejection by a department of the government authorized to hear and determine the claim, within the proviso of that act. The supreme court affirmed the opinion of the circuit court, delivered by Mr. Justice Gray, holding that the action of the first comptroller in passing upon accounts of public officers for fees had not been a final determination by that officer of the claims for fees before the passage of the act of March 3, 1887, because it had been uniformly held to be the law that such decisions could be reviewed in the court of claims, and because the act providing for the decision of the comptroller expressly provided that it should be subject to revision only by congress or the proper courts. It was held, therefore, that the comptroller was not an officer authorized finally to hear and determine claims, within the meaning of the proviso of March 3, 1887. That case does not govern this one, because we hold, on the authority of the Nichols Case, that the determination of the secretary of the treasury under section 2984 was final, and was intended to be final by congress, and not to be subject to review by the court of claims or any other tribunal.

The counsel for plaintiff in error cites the case of Railroad Co. v. Forsythe, 159 U. S. 47–61, 15 Sup. Ct. 1020, and other cases like it, to show that the decision of the secretary in this case is not final. The case cited was a controversy between two private litigants over a title to land derived from the United States. The case was, because of its subject-matter, within the jurisdiction of the federal court to decide between two litigants before it. In such a case the supreme court has uniformly held that the decisions of the land office upon a question involving the construction of the statutes of the United States is not final, but that it is for the court to construe the statute for itself, and determine the validity of the deeds issued by the land department. This decision is not at all at variance with the principle upon which our conclusion rests. In Decatur v. Paulding, 14 Pet. 497, it was expressly stated by the court that while, as between the United States and the pensioner, the secretary of the navy was the final tribunal for the construction of the statute, yet, if the question were to arise between two litigants in such a way that the court would have jurisdiction over the controversy, the court would not feel bound to follow the construction of the secretary. And so, in this case, if by any possibility the question of the construction of this particular section 2984 were to come before the circuit court in a matter of which it had jurisdiction, it would not

be bound to follow the construction of the secretary of the treasury; but the question here is whether, in a direct proceeding against the United States, and not in a suit of which the court otherwise has jurisdiction, the decision of the tribunal appointed by law can be reviewed by the court. We are clearly of opinion that this question must be answered in the negative.

2. But if the secretary of the treasury were not the final arbiter, and the circuit court had the right to look into the merits of the question presented in the petition, we are of opinion that the petition should have been dismissed. No cause of action arose for the recovery of these duties against the government, except by virtue of section 2984, and the only question is whether the case stated comes within the language of that section. That section authorizes the refunding, out of any moneys in the treasury not otherwise appropriated, of the amount of impost duties paid or accruing upon any merchandise which, by accidental fire or other casualty, has been destroyed (1) while the same remained in the custody of the officers of the customs in any public or private warehouse under bond; or (2) in the appraisers' stores, undergoing appraisal, in pursuance of the law or regulations of the treasury department; or (3) while in transportation under bond from the port of entry to any other port in the United States; or (4) while in the custody of the officers of the customs, and not in bond; or (5) while within the limits of any port of entry, and before the same have been landed under the supervision of the officers of the customs. Confessedly, the merchandise was not in any public or private warehouse under bond; it was not in the appraisers' stores, undergoing appraisal, in pursuance of the law and regulation of the treasury department; it was not in transportation under bond from the port of entry to any other port in the United States; nor was it merchandise which had arrived within the limits of the port of entry, and had not been landed under the supervision of the officers of the customs. So much is conceded. It is contended, however, that it was merchandise in the custody of the officers of the customs. The merchandise here had been taken to the warehouse of the importer under section 2899, which provides as follows:

"No merchandise liable to be inspected or appraised shall be delivered from the custody of the officers of the customs until the same has been inspected or appraised, or until the packages sent to be inspected or appraised shall be found correctly and fairly invoiced and put up and so reported to the collector. The collector may, however, at the request of the owner, importer, consignee or agent, take bonds, with approved security, in double the estimated value of such merchandise, conditioned that it shall be delivered to the order of the collector, at any time within ten days, after the package sent to the public stores has been appraised and reported to the collector. If in the meantime any package shall be opened, without the consent of the collector or surveyor given in writing, and then in the presence of one of the inspectors of the customs, or, if the package is not delivered to the order of the collector, according to the condition of the bond, the bond shall, in either case, be forfeited."

The bond had been given in accordance with the foregoing section. The purport of section 2899 is that the importer cannot receive from the custody of the officers of the customs any merchandise imported until it has been inspected and appraised, and found to be correctly and fairly invoiced, and so reported to the collector, unless a bond shall

be given in accordance with the section, in which case the merchandise may be delivered subject to redelivery under the bond on 10 days' notice. Now, the contention is that when the merchandise has been delivered into the manual possession of the importer, and carried by him to his warehouse, it is still in the custody of the officers of the United States by virtue of the bond. It may be that, reasoning abstrusely as to the meaning of the word "possession" in certain senses, this merchandise could be said to be within the possession of the government, though we doubt it. We do not propose to consider or discuss such a question. We think that section 2981, in referring to the custody of the customs officers, means the actual manual possession and control by those officers of the merchandise in question, and that, when it is delivered under bond to the importer, no matter what his obligation to return the same upon demand, it is in his custody, and not in the custody of the officers of the government. The reason of the statute requires such a construction. Its equity lies in the injustice of compelling an importer to pay duty on merchandise destroyed before it reaches his control, and before he can exercise any care with respect to its preservation. When, however, the property is delivered to him, to be kept in his own warehouse, under his complete control so far as preservation from injury by fire is concerned, there is no reason why he should not suffer a loss arising from a destruction of the property in his possession exactly as he does one from injury to other merchandise in his possession. The duties, then, are to be considered a part of the cost and value of the property to him. If the property had been appraised, and he had paid the duties, there is no question but that he could not look to the government to refund to him the duties paid, after its destruction by fire. We do not see that the giving of the bond changes the equity of the situation in any respect. The judgment of the circuit court is affirmed.